Mr. Bridger. That's correct, Your Honor. Thank you very much. It pleases the Court. I am Jeffrey Bridger, representing appellants in this matter. We seek reversal of the district court's judgment granting appellee's motion for summary judgment and the district court's denial of appellant's cross-motion for summary judgment. The crux of each of these motions is the familiar yet often difficult question of whether or not a contract for performance of specialized oil and gas well services in Louisiana's offshore oil patch is or is not a maritime contract, and therefore whether contractual defense and indemnity provisions are foreclosed by Louisiana's Oil Field Indemnity Act. So we embark again. I wish that I were able to do that as comprehensively as we would all like. Well, we'll do that when the case is over, but we wanted to give you the first crack. Well, I'm headed down that road, Judge. I'll see what I can do. I think this is one interesting thing about this case is that the factors that we have here, the factual circumstances that we have here, would at least allow Judge Southwick to join with Judge Davis, I think, in an opinion going our way, unlike what occurred in the Grand Court. And I'll get to that very shortly. I think that there are certain facts that the court below confused and, to some extent, that were ignored. And so I'd like to just run through those fairly quickly. Obviously, if the work here was to be done on a platform, right? That's correct, Your Honor. It's a fixed oil platform within the territorial waters of the state of Louisiana. They had to have a crane to do the job, and the only way they could get a crane out there was bring a crane barge. Is that right? It was Apache's choice to do it that way. That's correct. It was to hire through another intermediary, another contractor that Apache had been working with in that field, to bring a crane barge out to serve as a jack-up barge, not a floating crane barge, really. I'm sure it does float because it travels, but it's a jack-up barge. And, in fact... You said it was their choice, but what other choice did they have? Helicopter it in? Theoretically, they could have brought some sort of lifting apparatus in, drawworks or something like that, and set it up on the platform. That's not in the records, so I don't want to speculate about that, but it... You mentioned here, and the first time I saw it, there was a new reply brief. You can correct me if it was earlier. You talked about how the Pogo, whatever the name of it, became a jack-up barge while it was out there. That's not something you relied on before, it seems to me, trying to make this a vessel not as a vessel, it seems to me. That's not been an issue in this case, is it, that the barge with the crane on it had been jacked up and, therefore, wasn't free-floating. That's not been something that anybody's looked at until your reply brief, was it? Well, I believe that it was addressed and it was argued to some degree at the district court level, Your Honor. It's certainly a factor if, for instance, if Appellees, if LDI is arguing that the nature of the Pogo, in this instance, is a vessel and it's being used, it's a vessel as such, that has some significance, I think, when we start getting into Davis factors and trying to apply those to the facts of this case. It certainly has significance under other cases, such as the Riverside v. Intergy case, Thurmond, and a number of other cases, and Domingue, in which it's definitely, it's certainly an issue that the work that was being performed, to the extent that the platform, and certainly the record in this case shows that that was, in fact, the situation, and it's undisputed that there is no dispute whatsoever that that was the situation with respect to the Pogo. Now, the dispute you're talking about, dispute you're talking about, it's just that it was, when the crane was operating, it was jacked up, it was stationary. Is that what you mean by no dispute? That's correct. At all times that the Pogo was at that and being used, its crane was being used in any capacity, it was jacked up. I think we've got summary judgment cases, though, finding a jack-up barge to be a vessel. Under some circumstances, I don't doubt that that may be the case. I think in a jacked-up drilling position, I think we have summary judgment cases saying that's a vessel. And, Your Honor, I think the only, and I don't want to belabor the point, because I don't think that that's essential. I think it's one element of our argument that, in fact, this is simply STS, that is a specialty tool, specialty rental tools and supply, which became known as STS at some point during the district court proceedings. Our principal issue is obviously that they didn't have, STS didn't have anything to do with the Pogo as a vessel. They didn't work on the Pogo. They didn't contract for it to be brought out. They didn't agree to bring a vessel. They didn't agree to do any work on a vessel or be assigned to a vessel. And so, consequently, the STS contract should not be considered, clearly should not be considered a maritime contract. And to the extent that the Pogo was in any way involved in the work that STS was doing, its involvement, again, is purely as an adjunct to the platform itself, a work platform that was actually stationary at that platform. I mean, the judge found that the work couldn't have been done without that, and apparently the crane was necessary to complete the job. Is that right? Yes, Judge. There's no question that a crane or some sort of lifting device was necessary for them to complete that work. The critical issue, again, is that STS did not contract and did not ever involve itself in any way with the provision of this vessel or work platform. Part of that is that it was just an oral agreement, the actual work order. There was nothing written at that time. Had there been, I could see greater specificity. Maybe you would have seen these work orders before I haven't. But it seems to me that it was understood what was going to involve the vessel. Now, it doesn't mean it's a maritime contract, but it does mean there was knowledge on the part of the parties that, step by step, we're now at the step of needing a crane to make this happen. So your argument is, I don't know if I understand it or not, but you certainly are starting with an agreement between the parties that it's not contemplating a vessel. It doesn't refer to vessels. But you get to this specific project. Ultimately, after all the things were needed, again, it doesn't make it a maritime contract. But at that point, this vessel, this pogo, whether I should call it a vessel or not, is out there. And STS and everybody else is aware that that's the next stage to make this happen. It seems to me that that is where we are, what to make of that legally. But it's not as if you were oblivious to this, whether all your agreements in some way prohibited or never contemplated the use of a vessel. Seemingly, if one's needed, your agreement contemplated it would be used. Judge, I would have to say that STS's agreement didn't contemplate a vessel at all. And that's, I think, clearly shown in a manner, again, that's undisputed in the record and clear, because STS went out to do the job on the platform, worked to try to do the flowback job, which is purely a wellbore-oriented job. It was to essentially clean out the wellbore to improve production at that well on that platform. Let me ask you this. Didn't the Master Service Agreement, though, recognize the potential for the need of a vessel? The Master Service Agreement is a very general agreement that Apache used for, apparently, virtually all of its contractors, whether they be vessel contractors or specialty service or whatever. And so I would agree that, yes, the Master Service Agreement could contemplate that a vessel would be used. But we understand from this Court's precedent that a Master Service Agreement can't be interpreted without reference to the work order that actually specifies the work order. Correct. That's correct. In this instance, in reading those together or reading the testimony about the work order and the Master Service Agreement, what becomes clear is there was no contemplation whatsoever that STS would be involved with a vessel in doing its work. They didn't bring out a vessel. They didn't agree to get a vessel. Mr. Lopetri, the company man for Apache, was asked what new equipment was STS to bring out. And he detailed some flowback iron, a hydraulic choke manifold, a hydraulic valve. What exactly do you recall him telling you about the use of a crane barge? Just that we needed a crane, not a barge. STS representative on site, Mr. Savoie, didn't ask for a barge. He didn't care how Apache got some sort of lifting device out. What's that distinction, you need a crane? I'm sorry, sir? Why do you need a crane to clean out a well? My understanding is that the crane was only needed at this stage because the circumstances at the well required bigger, heavier equipment to be used. And they didn't have drawworks at that particular well site as most wells would have. It doesn't have anything to do with the need to elevate whatever's going down into the well or something like that. No, that's correct, Your Honor. It's strictly a matter of handling the additional equipment that STS was agreeing to bring out. I remember years ago having a case involving a man on land who was going around and doing well cleaning out operations. And he had a truck with a crane on it. And he ended up getting electrocuted because he hit a high tension wire. So, you know, it wasn't the same kind of case as this, but there must be some reason they have to lift things up to go down in those wells. Well, under certain circumstances, that would be the case. There's no testimony and there's no evidence that in this record or that we've seen that that was the case in this instance, that STS needed a crane for any purpose other than to help them handle for rig up and rig down the heavier, larger equipment that was needed in order to address the situation on that platform. Now, the point of this being that and our concern with that aspect of the vessel is that if STS's personnel need to go onto the vessel, work on a vessel, be assigned to a vessel to proceed with all of that, with their work, that's a very different situation than what we're facing here, where none of the STS personnel had any involvement with the vessel. Again, they didn't. And as Mr. LaPetrie said, they didn't tell him that they were going to get a crane barge out there. They didn't promise to send a crane barge out there. They didn't invoice Apache for a crane barge. LDI, SEPTA or VAS, the company through whom Apache got LDI's services, they're the party that provided a vessel. It's two completely separate contracts, two completely separate missions, two completely separate pieces of work that were being done. STS's work was 100% on the fixed platform within the state of Louisiana and did not necessarily need a vessel. Yes, they needed a crane as it turned out, but any crane would have done. It happened that under the circumstances that were given to them by Apache, Apache chose and perhaps had to choose to bring in a barge with a crane on it that they could jack up next to that platform to do that. So that's the, I think that's the gist of the factual lay of the land, and I'd like to reserve a little bit of time for rebuttal. You have five minutes left. Thank you, Mr. Pritzker. Thank you, Your Honor. Mr. Escovedge. Escovedge. Thank you. Good afternoon. Long time. Welcome back. Thank you. Thank you. It's my privilege to represent Larry Duaron, Incorporated, and Mr. Jackson in this matter. And who are you representing? What's the pronunciation? Duaron. I wouldn't have gotten to that, but okay. Larry Duaron and Mr. Jackson. And in answer to the court's earliest question in this, can we come up with some way to solve these seemingly eternal cases that pop up? Maybe we have a solution here, because I was looking back at the cases that have, in fact, found these to be maritime contracts. And there's a consistency that runs throughout them. There's two issues, and I think the court touched upon some of them earlier. One, is the vessel necessary for the completion of the contract? If it is, it's a maritime contract. That's it. No matter how ancillary it is or peripheral it is? Necessity being the key, not ancillary. The cases that we do have the ancillary aspects to, which would be the Thurman case and one of the others. One, the person had stepped off onto the platform. And after he was onto the platform, off of the vessel, a piece of equipment on the platform popped out and hit him and damaged him and hurt him. The fact that he was transported and there was a vessel nearby was unrelated to his injury at all. So it was ancillary. The presence of the vessel didn't make any difference. It seems to me your standard would go against some case law. Of course, that's what you're saying. Maybe we need to straighten this out. It seems to me just bringing supplies out to the rig is absolutely necessary. But is that, to use case law that you may be trying to say we should abandon, is that inextricably intertwined with the necessary operations? It seems to me a lot of things, ancillary was a great word, everything George Davis says, I would say that too, but he was right. How do you avoid making everything at a rig a maritime matter because a vessel is going to get people out there, is going to get the equipment out there? That's my point, is the ancillary ones. There are a couple of cases that describe it as ancillary and therefore not maritime. And so we do have the ones where somebody, just because the vessel is present does not per se make it maritime. But the ones that do make it maritime are the ones where the person aboard the platform, the platform, not the vessel, are engaged in using the equipment, the equipment of the vessel. So the drawn derrick works, the barge cranes, the actually using the equipment at the time of the injury, at the time of the injury, that's what ties it back to the maritime component. It's not simply that there is a vessel there. Because one of the cases involved a person who was on a vessel and he tripped over his own equipment and the court said, that's not maritime, just because you're on a vessel doesn't make it maritime. But the ones that do all involve the use of the equipment that is attached to or fixed to the barge. And we know under the extension of Maritime Act that something that happens because a vessel is involved and it reaches onto the land keeps it as maritime. You know, that's all tort law, isn't it? Largely, largely. Why should tort law apply here in trying to figure out what kind of contract it is? Well, we have a contract that at its core is to do certain things, which is to work on offshore rigs or on rigs, right, on the platforms. And it says that if you use a vessel, you need to have insurance. You have longshore insurance. You need to have the insurance. Okay? They contemplate in the Master Service Agreement that there will be maritime components that when you use the vessel, when you use the vessel, you don't have to hire the vessel, negotiate the vessel, pay for the vessel, charter the vessel. If you use the vessel, okay, then you need to make sure that you're properly insured for the maritime risks that are inherent in using the vessel. In this instance here, it's undisputed. Even, remember, this is a summary judgment. Go back to the statement of uncontested material facts, right? That's where we go back to. And in the statement, it was necessary for the completion of this job that that vessel be there with its crane. It was not jacked up. There's not a mention of jack up in the trial court record. I just want to make that clear, too. This was a floating barge. But do you actually look for that? I had one of my law clerks search for it, too. I don't know if this issue just came up in the reply brief, as it seemed to me. Are you confident that there's nothing addressed by this and Judge Daugherty or anybody else in the district court about it being jacked up? In the summary judgment proceeding, absolutely not. It wasn't there. It was not there. If you look at the statement of uncontested material facts, they say they needed it, but it was part of the rigging up and rigging down, so it's reclassification. But it was necessary to complete this project to its terminus. Well, Judge Davis already addressed, and you may be familiar with cases he's talking about, to say that that doesn't matter in this case. It's still a vessel as a vessel, despite being jacked up. What case, in your view, would tell us that? Oh, there are some. I think we might even have some that were cited in the briefs. In fact, Davis, I might be wrong. Davis might have mentioned that barges that are jacked up can still be vessels.  That goes to whether this was or was not a vessel being used as a vessel. But on the record, which is closed to summary judgment, the statement of uncontested material facts by both sides mentioned nothing at all about it being jacked up. Don't discuss it. And it's not relevant to the determination by the trial court or actually by this court at this time. You know, we have a line of cases like Thurman and Doming where they were doing wireline work actually on the jack-up drilling barge. And they said wireline work is just not maritime activity. So why would flowback work be maritime activity? Well, that's when we get into whether you're taking the broader view or the narrower view of what's going on here. The wireline, per se, is not maritime activity. The flowback is not, per se, maritime activity. But in this instance, it wasn't at the time that we were doing the flowback. He was using the barge to complete his tasks and his job and his contract while on the platform. Both those cases I mentioned, they were actually doing the job on a vessel. That's right. And if I'm not mistaken, Your Honor, Thurman, if I'm not mistaken, was one where the gentleman slipped over his own equipment. That was the nature of the injury at the time of the accident. So that didn't make it maritime. There was no saltiness to that. It was he just tripped over his own stuff. And the other one that we're dealing with, I do apologize, the case of the escape from Domain, Domain was one where the gentleman stepped onto the platform and something happened on the platform unrelated to the vessel's presence. That was merely a transport. It didn't cause the accident. But what we're dealing with, every case that involves an injury that was caused by the use of the equipment of the vessel, use of the equipment of the vessel, derrick and jackworks, cranes, that sort of thing, all of those are maritime. Those are maritime. Those are not ancillary. Those are not secondary. They are using the vessel as a vessel and her equipment that is affixed to it. And that's what we have here. You know, I mean, conceptually, though, you can see that as a good reason to say this is a maritime tort. But why would it be a maritime contract? Well, the contract becomes maritime because it's, because STS, contrary to what you just heard, STS, through, it's Mr. Savoy, who happens to be the plaintiff, said, I need this equipment out here. And he used it. He directed it. He is the one who was running the show. That was what he basically said. And he was directing, at the time of the accident, he was directing the crane operator upon the barge, Mr. Jackson, do this, do that, go this way, go that way, up, down, move it around. He was directing the operation. of the vessel's operator. What does that have to do with characterizing the contract? He was then using, he was utilizing the vessel as vessel. And the contract, remember, there's no, as far as anybody knows, there's no written work order here. So you look at the general contract, the big contract. Well, apparently there was a verbal work order. There was a verbal, right. And it included all the things that are incorporated, do it safely, do it completely, do it to completion, do it however you need to do. And when Mr. Savoy said, I need this, and he's directing it, he is actually using a vessel to perform his contract. That makes it maritime. He's using a vessel to perform his contract. Now, I'm not going to say that the entirety of the contract was or was not maritime. Davis seems to suggest that even once you get into a part of it being maritime, it all becomes maritime. What we're focusing on here is the contract for purposes of the use of the vessel is maritime, okay. If he was doing some other work that was unrelated to marine activity, he was cleaning the well, he was doing his back flows and whatever else he might be doing, I'm not concerned about that. But when he utilized and incorporated into his performance of the contract, the barge, the pogo, the floating barge, he then, for those purposes, that part of the contract was, in fact, maritime. It was, in fact, insured under maritime insurance, okay. It gave rise to a maritime claim. He filed a maritime claim. That converts. You've got the tort that he was injured in, but for purposes of the contract, that part of the contract was maritime. I wonder how often they needed a crane to do a flow back job. I don't know. I mean, I gather since they didn't send the barge out there, they didn't really expect to need a crane. When they issued the work order, I assume they didn't think they would need a crane. Otherwise, they would have sent one. Perhaps. We'll never know. I mean, isn't that the way you look at how you characterize a contract? What did the parties have in their mind when they issued that work order? Well, I think what the parties had in their mind is get the job done. And if you need a barge, bring it on out. And that's what they did. STS is the one who said, we need this thing out here. So their actions, if they underestimate, if you've got a contractor and he underestimates what it's going to take to finish a project, and then comes to you and says, oh, wait a minute. I need this other bit. I need a plumber to do some work. How long did this entire job take? It was just a few days. It failed a couple of times before the barge was brought out. They tried every which way they could get to do it without spending the time and money on a barge. They couldn't do it. They needed the barge. Please bring the barge out. They brought the barge out. They then tried again. It was finished the next day after the injury, if I'm not mistaken. So it was just a matter of a few days. But it was the mission of the vessel, the sole and exclusive mission of the vessel, was to come out to this platform so that Mr. Savoy could use it to complete STS's job. That was the only reason it was there. That is the only reason it was there. And in fact, that gets to what did the parties contemplate? Well, we have a change order here. We have something that needs to be done a little differently. Get that barge out here. Otherwise, we can't finish the project. And when you read through the original brief that was filed by the Appalachians, it sort of sounds like, well, there's flowback. But this is all rigging up, rigging down. It really wasn't part of the contract. I can imagine what would have happened had they not finished it and removed the equipment and closed everything up properly. This barge was necessary for them to complete the project. Otherwise, they couldn't have used the platform again. The oil well would have not been usable. So it was an essential component of completion of STS's contract. They tried, couldn't do it, and said, we need a floating vessel. Please come out and do it. And that's what they did. And these cases that both sides are relying on address one of the points that you're making here, which is you can look just at this one piece. I mean, there was no maritime feature of this, arguably, until the crane became necessary. So everything is non-maritime. This little piece is maritime. We're back to non-maritime. Is that at all discussed in the case law? You said that Davis itself perhaps said that once maritime, the whole thing becomes maritime? Actually, there was a bit in Davis that said that. If it becomes maritime, the whole contract is. But again, that's not really the issue. It's troubling in this case that this whole flowback would become a maritime operation because of a one-day situation. But so I'm just wondering is how settled is what you're telling me? I think that based upon the Hoda Campbell and Devin Louisiana string of cases, it is pretty well settled. I think in this context of what happened here, it is settled. It's a maritime contract. I think it's very settled. What's a maritime contract? How much of what happened? That the STS contract at that point with the use of the vessel is a maritime contract. And the next day would no longer be maritime? I think that's very possible. They're hybrid cases. I mean, they're hybrid contracts. And several cases describe them as being, you can have a contract that is all maritime, all non-maritime, or part of both. That's what these cases are. And I think that's what, I mean, quite honestly, from a jurisprudential standpoint, trying to sort this out is because it is very fact-specific. And I think the courts have said it's fact-specific. And the only facts that we have here is that a floating vessel came out, did the work, he directed the work, the plaintiff himself, on behalf of STS, directed the work, told him what to do, and as a result was injured. The core part here is that the crux of this lawsuit is that the injury, the activity occurring at the injury moment was, in fact, maritime. If you look at it from LDI's standpoint, Mr. Duaron's standpoint, he is a vessel, and how does he go out to do vessel work and not get the benefits and protections of vesseldom, of maritime law? Well, that's true for a tort case. I don't quite understand how you convert that over to a contract. Well, he's part of the contract. He is a third-party beneficiary of the contract between STS and Apache. He gets to benefit from it. LDI is, in fact, a protected party under the contract, under the master service contract, and protected under the insurance policy. Who paid for the crane? LDI? No, LDI is the owner and operator of the crane. It was paid for, I'm assuming, I'm not 100% sure, by Apache since they're the ones who hired it. Apache are one of the subsidiaries, so the barge and the crane was not furnished by STS. No, it was not furnished by STS. It was controlled by STS and directed by STS, not hired, not chartered by STS. I mean, but the crane operator was not an STS man. No, he was LDI. He was LDI. And so LDI comes out there under the assumption that when it comes out to do the work, it's going to be protected by the master service agreement. And that's where you get, where do you start drawing lines where it's maritime up to a point, but not maritime, but the case law, the Hoda case law, the Campbell case law, the Devon, very, very clear. Each one of those involved the actual use by the injured person of the crane, in order of the equipment on the vessel in order to complete the project. But what if there's another employee out there on the rig, not on the Pogo, but on the rig, also involved in the flowback activity at exactly the same time, but whatever he was doing was not involved with the crane, but he was also injured. Would that, I mean, we're talking about where are we drawing the lines? Can we draw the line at the same chronological time and say this other employee would not be subject to the indemnity process that applies to what we're dealing, talking about? If he was injured by virtue of the activity of the train, he would be covered by maritime law. I'm trying to say he wouldn't be. If he's not, if he's injured on a totally separate thing, then you get back to the Thurman line of cases, which makes the... Still operating on the flowback. He was still involved with flowback in some way, in my hypothetical, but not with what happened to this poor fellow who got strung up when the crane lifted. So it's the same overall process of the flowback, which is non-maritime, non-injured by crane activity, happens exact moment in time. So that part of the contract between SGS and I'm drawing a blank now, is non-maritime and what we're dealing with here is maritime? That would be true. I think you've got maritime and non-maritime. You've got several ability. You can split the contract because that's what this court has done and told us that is how you do it. You do in fact split, you can have multiple facets to the contract and that is very clear in the jurisprudence. Are you familiar with Supreme Court case of Norfolk versus Kirby? Yes, Your Honor. I mean, in that case, you had a contractor to ship goods from, I think, Australia to Gadsden, Alabama and the first leg of the trip was ocean and I went to Charleston and then the next leg of the trip was a train. The train wrecked and the goods were damaged. So the court said this whole contract is maritime because the primary objective of the contract was to accomplish the transportation of the goods by sea to the coast of the United States. The fact that a small part of the transportation was by land did not change the essential nature of the contract. So how would you apply that case to our facts? That particular case actually expresses maritime law very broadly, which I think is what the Supreme Court has done and what this court has done. Maritime law is designed to make sure that things involved in any way with maritime commerce. Well, it says if it's the primary objective of the contract. That was even broader than what we're talking about here. Well, I mean, I think it'd be argued that the primary objective of this contract was to do the flowback job on the platform. The primary job, yes, until they amended it and brought in the vessel. And when you look at the case law of this court, okay, the panels that have decided it, the Hoda case, the Campbell case and the others and Devin, you know, the case law in this circuit is such that, is such that when you start using the equipment and or the vessel as such, it becomes maritime. Thank you, Your Honor. Thank you, Your Honor. Okay, Mr. Bridger, back to you. Give me your take of the Norfolk v. Kirby. Certainly, Your Honor. Norfolk v. Kirby stands for the proposition that the principal purpose of a contract is what is going to govern what law applies to it. Not, and Norfolk expressly says this, not just whether or not a vessel happens to be involved at some point or not, not whether a train happens to be involved in one small part of it. And that's exactly the situation that we have here. Well, it hasn't though, the Fifth Circuit, perhaps gone well beyond that errantly or otherwise in the cases that we've been talking about. We haven't looked at primary purpose. We looked at whether the vessel was necessary or unavoidable use of the vessel. Actually, I don't think the Fifth Circuit or frankly any court has ever, or any appellate court has ever adopted a position that wherever a vessel is necessary, the whole, everything that goes on, the whole worksite, every contract from every contractor on that site is suddenly going to become maritime. We don't need that for this case. We just need to have this little piece of it dealing with the poor injured party to become a maritime contract. I'm sorry, I didn't understand. Well, we don't need the whole thing. You said that no case, no court has ever held that everything becomes maritime. But we have held, it seems to me, that when a vessel is a necessary part of the completion of the project, at least that piece of it becomes maritime, such as is involved in this case. Well, again, Your Honor, the empirical necessity of a vessel is exactly what Naufook said was not a standard, was not a bright line rule for determining when a contract is going to be considered maritime or not. And under this Court's decision in Grand Isle Shipyard versus Seacorp Marine that Judge Davis wrote, the en banc opinion, Judge Southwick joined in the dissent, and I finally get to give you my unifying principle, the same rule was applied, ultimately. The majority applied the same rule that Naufook applied, which was it's the majority, it's what the overall work of the contract, not what happened in respect of a particular tort, but the overall work of the contract, where that was performed, what it was, what its character was, is what defines whether a contract is maritime or not. And that is a consistent thread, actually, throughout this Court's jurisprudence and the Supreme Court jurisprudence. Cossack, Naufook, all of those cases focus on the principal purpose of the contract. And in this case... No, I think, honestly, our cases apply to all those Davis factors. I don't read our cases as saying look at the overall objective of the contract. Well, certainly, Your Honor, I would agree that we use the Davis factors. The Davis factors, the purpose of that, I think when they were originally promulgated in, I believe it was Thurman that was just before, in which there was a recognition of a need for that kind of test. Those are designed to focus the analysis of the facts in a way that leads to the result of determining where was the principal performance of the contract? What was the principal performance of the contract? They're not in themselves the answer to the question. They're a way of getting to that answer. And one thing in particular that I think the Court really is worthwhile for the Court to note, well, two points, actually. For one thing, Riverside v. Intergy is one case, very recent case in this Court that clearly disposed of that empirical, physical necessity argument about a vessel just happening to be there and being used in some ancillary way. And that's exactly what we have here. You have a flowback operation on a fixed platform. And this is the, you know, getting back to the idea of the unifying principle. In this case, we have situs, which was what Judge Southwick and Judge Garza and others wanted to see in the Grand Isle situation. We have situs here. It's a fixed situs in the state of Louisiana. And we also have purpose, fundamental purpose of what's going on. Very briefly, the one thing that I think it's extremely important to focus on in looking at this jurisprudence and to be very careful of is the word rig. This is a fixed platform. It is not a rig. Hoda v. Rowan involved a rig, a modu, a special-purpose drilling vessel. And the work in that case, and that's the primary case that the district court relied on in our case and in a prior case that wasn't appealed, is the issue of, the work was actually being performed on a special-purpose vessel. It was forwarding the purpose, the mission of that special-purpose vessel. Your time's up. I'm sorry, Your Honor. Let me ask you one question. Yes. Is Mr. Guara still in the case? Why? Is he a part of it? Does he have an interest in the case? Yes. Tell me how that works. Procedurally, the situation that developed was that Mr. Savoy is the injured plaintiff who fell when the crane injured him. His case was settled, ultimately, and in the course of reaching that settlement, the parties all agreed to sever the contractual case from that underlying tort case. Mr. Duaron is still a party as owner of the barge, owner and, I presume, operator of the barge. The only party that's... STS and oil states are merged entities. That's the reason you have oil states when you don't hear anything else about them. The only party that's really not in the case anymore, that's in the caption, is Zurich. That was actually dismissed. Any claim against Zurich directly by the barge interests was dismissed as part of the final judgment that allowed us to come to you today. Thank you very much. Thank you, Your Honor. And court will be in recess until one o'clock tomorrow afternoon.